# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
)
**KEVIN CROWLEY,**                      )
                                 )
     **Plaintiff,**                 )
                                 )
           v.                   )       **Case No. 16-cv-00498 (APM)**
                                 )
**SONNY PERDUE,[1]**             )
**Secretary, U.S. Department of Agriculture,**  )
                                 )
     **Defendant.**             )
_____ )

## MEMORANDUM OPINION AND ORDER

## I.    INTRODUCTION

Plaintiff Kevin Crowley was employed as an Engineering Branch Chief with the Food Safety Inspection Service at the United States Department of Agriculture ("USDA") from September 2012 to December 2015. On March 20, 2015, USDA approved Plaintiff's request for an accommodation allowing him to telework twice a week because of his disability. A few weeks later, on April 10, 2015, Plaintiff's supervisors placed Plaintiff on a Performance Improvement Plan ("PIP"). As a result, Plaintiff filed a formal Equal Employment Opportunity complaint on June 23, 2015, claiming that the PIP was in retaliation for his Reasonable Accommodation request. Plaintiff ultimately filed this lawsuit against the former USDA Secretary, alleging that his employer, USDA, retaliated against him in violation of the Rehabilitation Act of 1973, 29 U.S.C. §§ 791 *et seq.*

---

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the court substitutes the current Secretary of Agriculture as the defendant in this case.

This matter is before the court on Defendant's Renewed Motion for Summary Judgment. For the reasons stated below, the court denies Defendant's Motion.

## II.     BACKGROUND

### A.     Factual Background[2]

#### 1.     *Plaintiff's Performance Before November 2015*

From 1988 until 2012, Plaintiff worked at the U.S. Department of Commerce in a variety of employment roles. Pl.'s Opp'n to Mot. for Summ. J., ECF No. 27 [hereinafter Pl.'s Opp'n], Ex. 1, ECF No. 27-3 [hereinafter Crowley Dep. II], at 1.[3] Plaintiff's performance reviews rated him on one of five levels: unacceptable, marginal or minimally satisfactory, fully successful or fully satisfactory, commendable or superior, or outstanding. *See* Def.'s Mot. to Dismiss or, in the Alternative, for Summ. J., ECF No. 6, [hereinafter Def.'s Mot. to Dismiss], Ex. 1, ECF No. 6-3 [hereinafter Def.'s Mot. to Dismiss Ex. 1], at 51–52. Plaintiff typically was ranked "commendable" or "outstanding" during this period. Crowley Dep. II at 2–4.

Plaintiff moved to the USDA in September 2012, where he was employed as an Engineering Branch Chief for telecommunications and network operations in USDA's Food Safety Inspection Service ("FSIS") until his retirement on December 31, 2015. *Id.* at 1; *see* Def.'s Renewed Mot. for Summ. J., ECF No. 26 [hereinafter Def.'s Mot.], Def.'s Statement of Material Facts as to Which There Is No Genuine Issue, ECF No. 26 [hereinafter Def.'s Stmt.], ¶ 1; Pl.'s Opp'n, Statement of Material Facts for Which There Is a Genuine Dispute, ECF No. 27-1

---

[2] The following citations generally are to the record, as opposed to either party's statement of material facts. Plaintiff did not submit his statement of *additional* facts until after the filing date for Defendant's Reply, *see* Notice of Errata, ECF No. 30; Pl.'s Statement of Material Facts for Which There Is a Genuine Dispute, ECF No. 30-1 [hereinafter Pl.'s Additional Stmt.], at 4–14, so Defendant was never afforded the opportunity to respond. As for Defendant, the facts listed in his statement of facts typically were immaterial or contradicted by the record. For this reason, the facts generally are drawn from the record and supplemented by the parties' (timely) statements of facts where possible.

[3] All citations to the exhibits of either party are to the page numbers electronically generated by CM/ECF.

[hereinafter Pl.'s Stmt.], ¶ 1.  From mid-2013 until his retirement, and even before his Reasonable Accommodation request was approved on March 20, 2015, *see infra*, Plaintiff teleworked two days a week.  Def.'s Mot., Attach. 1, ECF No. 26-1 [hereinafter Crowley Dep. I], at 28; *see* Def.'s Stmt. ¶ 15; *cf*. Pl.'s Stmt. ¶ 15.[4]  Prior to November 2015, there are no documented issues with Plaintiff's performance on the record.  For example, in fiscal year 2013, Plaintiff's then-direct supervisor, Miguel Rivera, gave him a performance review of either "commendable" or "fully successful."[5]  Crowley Dep. I at 6–7.  In fiscal year 2014, Plaintiff was given a rating of "fully successful."  Def.'s Mot. to Dismiss Ex. 1 at 51.  Plaintiff was given the same rating in fiscal year 2015, which ended on September 30, 2015.  *Id.* at 52.

   2. *Issues Leading up to the PIP*

 In October 2014, Rivera left USDA and Charles Thompson, Plaintiff's peer, was appointed as Plaintiff's acting first-line supervisor.  Def.'s Mot., Ex. 1, Attach. 2, ECF No. 26-1 [hereinafter Sisto Dep. I], at 52; Def.'s Stmt. ¶ 7; Pl.'s Stmt. ¶ 7.  In order to make the transition smoother, Plaintiff's second-line supervisor, Jennifer Sisto, provided oversight on telecommunications issues.  Sisto Dep. I at 52; *see* Def.'s Stmt. ¶ 9; Pl.'s Stmt. ¶ 9.

 According to Defendant, when Sisto began providing oversight, she began to express concerns with Plaintiff's performance.  Def.'s Stmt. ¶ 20.  For example, Sisto noticed that some telecommunication accounts for people who had left USDA years before were still open and that the agency therefore continued to pay for those accounts unnecessarily.  Sisto Dep. I at 53; *see* Def.'s Stmt. ¶ 20.  On at least one occasion, she called Plaintiff into her office to discuss those

---

[4] Plaintiff disputes that he was permitted to telework for the *entirety* of this period.  *See* Pl.'s Stmt. ¶ 15 (noting that all telework was suspended for a period in early March 2015); *id.* (citing a roughly two-week period in April 2015 when Plaintiff did not telework).

[5] Plaintiff only received a yearly performance review, though he cannot remember exactly which rating he received from Rivera.

accounts, as it was Plaintiff's responsibility to ensure that they were closed properly. Sisto Dep. I at 53; *see also* Def.'s Mot., Ex. 1, Attach. 4 [hereinafter Sisto Decl.], at 63, ¶ 5. Sisto also noticed that six conference lines were still open—despite one employee assigned to one of the conference lines having left two years ago—and instructed Plaintiff to close the lines. Sisto Decl., Attach. 1 [hereinafter Sisto Emails], at 71. Similarly, Sisto informed Plaintiff of lines open for personnel who had since left the agency, staff with more than one line open, loaner devices that had been out for more than four years, and numerous devices being paid for with no one assigned to them. *Id.* at 72. Sisto instructed Plaintiff to review this information at least quarterly to ensure that the agency was not overspending. *Id.*

Defendant contends that concerns with Plaintiff's performance extended to other areas as well. For instance, on December 8, 2014, Thompson emailed Plaintiff asking him to stay up to date on tickets made for service outages, some of which were up to two months old. Sisto Decl. at 64–65, ¶ 10. Moreover, according to Sisto, she was frequently contacted about issues in areas falling under Plaintiff's responsibility, such as a "lack of prompt service restoral of down telecom connectivity." *Id.* Additionally, on February 24, 2015, Janet Stevens—Plaintiff's third-line supervisor—emailed Plaintiff about two offices that had lost their telecommunications for days due to lack of payments on their invoices. Sisto Emails at 75–76; *see* Def.'s Stmt. ¶ 10; Pl.'s Stmt. ¶ 10.

On March 3, 2015, Thompson emailed Sisto and Stevens to inform them that he had spoken with Plaintiff and informed him that he would be suspending Plaintiff and his team's telework due to poor performance (though telework was not actually suspended, as Plaintiff had a pending Reasonable Accommodation request at the time). *See* Pl.'s Opp'n, Ex. 5, ECF No. 27-7 [hereinafter Keegan Rep.], at 8. On March 9, 2015, Stevens handled some outstanding tickets that

Plaintiff had not yet addressed. Sisto Emails at 83. On March 17, 2015, Sisto emailed Plaintiff asking him for updates that he was late in providing. *Id.* at 87. Similarly, on March 26, 2015, another USDA employee asked Plaintiff about open lines for which FSIS was paying. *Id.* at 80–81. Apparently, FSIS continued to receive invoices for the lines into February 2015, even though Plaintiff had told the budgeting office that the lines should only be funded through December 2014 because they were going to be closed. *See id.* According to the record, Plaintiff was unresponsive to these sorts of inquiries until the issues were raised with Sisto. Sisto Decl. at 64, ¶ 8.

On April 2, 2015, a manager at FSIS' Atlanta office emailed others in FSIS about their service being out for eight days because of a missed payment. Sisto Emails at 77–79. This was the second occurrence of a loss of service for that office in 2015 and their fifth loss of service in five years. *Id.* at 79. This incident prompted Stevens to launch an internal investigation into the "telecom processes, procedures, and management controls." *Id.* at 77.

Plaintiff contests the foregoing narrative to the extent it suggests a problem with his performance. *See* Pl.'s Stmt. ¶ 20. Plaintiff claims that when Sisto and Stevens began scrutinizing his work, "there was nothing said about performance." *Id.* Instead, Plaintiff says, Sisto's and Stevens's scrutiny merely consisted of general "business as usual inquiries into what was happening with certain items," and Plaintiff responded to those inquiries immediately once he was aware of their existence. *Id.* (citing Crowley Dep. II at 12–15).

Plaintiff also claims that the aforementioned issues were present even before he began his tenure at USDA. Crowley Dep. II at 12–14; *see* Pl.'s Stmt. ¶ 20. For example, Plaintiff explains that he had to close multiple tickets that had been open for years when he first joined USDA in 2012 and that his team only started to get ahead of those issues in 2014. Crowley Dep. II at 13; *cf.* Pl.'s Stmt. ¶ 20. Moreover, Plaintiff asserts that part of the reason for lines remaining open was

the lack of a formal "out-boarding process," whereby managers could notify the telecommunications team if someone was leaving their division. Crowley Dep. II at 16. Because no such process existed within the agency, Plaintiff says he was not aware of who was leaving the agency and when, and thus he did not know whose accounts to close and when to do so. *Id.* Additionally, Plaintiff notes that he had three vacancies on the telecommunications team during this time, which, combined with the increase in workload, made fulfilling requests difficult. *Id.* at 6–7.

### 3. *Plaintiff's Reasonable Accommodation Request*

In the midst of the above events, on February 13, 2015, Plaintiff filed a "Reasonable Accommodation" request with USDA, asking to telework four days per pay period based on his disability—spinal stenosis and arterial insufficiency.[6] Pl.'s Opp'n, Ex. 2, ECF No. 27-4 [hereinafter Pl.'s Ex. 2], at 25. According to Plaintiff's doctor, Plaintiff's disability restricts his ability to "sit in confined places and walk long distances without pain or weakness." *Id.* at 20. Plaintiff had been teleworking prior to his Reasonable Accommodation request since mid-2013. Crowley Dep. I at 27–28; *see* Def.'s Stmt. ¶ 15; Pl.'s Stmt. ¶ 15. Thompson and Sisto became aware of the Reasonable Accommodation request on March 3, 2015. Sisto Decl. at 66, ¶ 19. Based on the record, the Reasonable Accommodation request appears to have been approved on or around March 20, 2015. Pl.'s Ex. 2 at 1.[7]

---

[6] The parties dispute the amount of days that Plaintiff requested to telework. *See* Def.'s Stmt. ¶ 15; *cf.* Pl.'s Stmt. ¶ 15. While this fact is immaterial, as Plaintiff's request was granted regardless, the record does contain the actual request, which states that Plaintiff requested to telework four days per pay period (i.e., two days per week). Pl.'s Ex. 2 at 25.

[7] It is unclear from the present record exactly when the agency granted Plaintiff's request. The only evidence in the record on this score is: (1) the EEO Counselor Report, which recites Plaintiff's allegation that the request was approved on March 20, 2015, *see* Pl.'s Ex. 2 at 1; and (2) Plaintiff's untimely statement of additional facts in support of his Opposition to Defendant's Motion for Summary Judgment, which states that, on March 20, 2015, "Thompson was informed that [Plaintiff's] reasonable accommodation request was granted," citing a March 20, 2015 email from an HR Specialist to Thompson in support of that proposition. Pl.'s Additional Stmt. ¶ 40. That email, however, does not

## 4. The PIP and Plaintiff's Equal Employment Opportunity Complaints

Sisto and Stevens discussed issuing the PIP to Plaintiff with Thompson sometime in "early 2015." Def.'s Mot., Attach. 2, ECF No. 26-1 [hereinafter Thompson Decl.], at 60, ¶ 5. On April 3, 2015, Thompson called a member of Employee Relations to inquire about how to issue a PIP to one of his employees. Pl.'s Opp'n, Ex. 3, ECF No. 27-5 [hereinafter Pl.'s Ex. 3], at 63. Thompson signed and dated the PIP April 10, 2015, the last day he held his position as Plaintiff's supervisor before the position was filled by Elamin Osman. *Id.* at 66; *see* Pl.'s Ex. 2 at 14. Shortly thereafter, on April 24, 2015, Osman and Sisto presented the PIP to Plaintiff. Pl.'s Ex. 3 at 69; *cf.* Def.'s Stmt. ¶ 22; Pl.'s Stmt. ¶ 22. The PIP states that Plaintiff was placed on the PIP because he failed to reach a "fully successful" level in two critical elements of his performance as a Supervisory IT Specialist. Pl.'s Ex. 2 at 14. It also lays out specific examples of what Plaintiff needed to accomplish in 60 days in order to reach the "fully successful" level, such as "meeting 90% of all deadlines" and "identify[ing] . . . costs for 80% of all [Engineering-Branch] managed hardware and software." *Id.* at 16.

On June 19, 2015, Osman sent Sisto an email indicating that he was meeting with Plaintiff later that day and that he intended to close out the PIP, as Plaintiff had met the expectations required of him. Pl.'s Ex. 3 at 70; *see also* Pl.'s Opp'n, Pl.'s Ex. 4, ECF No. 27-6 [hereinafter

---

support Plaintiff's allegation. In the March 20, 2015 email, the HR Specialist asked to speak to Thompson about the request and explained that she would draft a decision letter for Thompson's signature "*[a]fter* a decision [was] made regarding [Plaintiff's] request." Pl.'s Opp'n, Ex. 3, ECF No. 27-5, at 60 (emphasis added). In any event, as with the scope of the actual request, *see supra* note 6, the exact date of agency action is not material here, as there is no genuine dispute about when Plaintiff's supervisors became aware of his Reasonable Accommodation request, which was March 3, 2015. *See* Sisto Decl. at 66, ¶ 19.

Sisto Dep. II], at 21. The PIP had a start date of April 24, 2015, and a proposed end date of June 22, 2015.[8] *See* Pl.'s Ex. 3 at 65.

Plaintiff filed an informal Equal Employment Opportunity ("EEO") complaint on May 15, 2015, and a formal EEO complaint on June 23, 2015, claiming in both that USDA had initiated the PIP because of Plaintiff's Reasonable Accommodation request. *See* Pl.'s Ex. 2 at 1–2. Plaintiff now also claims that the PIP was extended beyond its original June 23, 2015 end date because he had filed EEO complaints. *See* Compl., ECF No. 1, ¶ 117. The record supports Plaintiff's claim that the PIP was extended beyond the original 60-day period. According to an email from Osman to Plaintiff on July 15, 2015, Osman and Plaintiff were still meeting to discuss the PIP at that time, suggesting that the PIP had not been closed out on June 19, 2015, as Sisto believed it had been. Pl.'s Opp'n, Ex. 6, ECF No. 27-8 [hereinafter Pl.'s Ex. 6], at 3. In that same email, Osman recommends that he and Plaintiff continue their weekly meetings before making an assessment on August 15, 2015. *Id.* In a September 17, 2015 email, Osman again reached out to Plaintiff regarding the PIP. *Id.* at 1. This time, Plaintiff responded that Osman had not communicated or met with him since the mid-July email. *Id.* Finally, Plaintiff reached out to Osman via email on October 13, 2015, complaining that Osman had only made four of the 24 weekly meetings that they had scheduled—two in May, one in June, and one in October. Keegan Rep. at 7.

The PIP did not officially end until November 10, 2015, when Osman issued a document stating that the PIP had ended. Crowley Dep. I at 43.

---

[8] Defendant claims that Plaintiff was placed on the PIP on April 16, 2015, based on Plaintiff's recollection during his deposition. *See* Def.'s Stmt. ¶ 21 (citing Crowley Dep. I at 15). Plaintiff, on the other hand, contends that the PIP is dated, and was supposed to be issued on, April 10, 2015. Pl.'s Stmt. ¶ 21. It appears that both sides are wrong. Although the PIP states that it lasts 60 days from April 10, 2015, HR determined that it would actually last 60 days from April 24, 2015, the date the PIP was presented to Plaintiff. Pl.'s Ex. 3 at 65 (email from Osman to Sisto and Stevens).

### B.     Procedural Background

On March 15, 2016, Plaintiff filed this action against Defendant under the Rehabilitation Act of 1973, 29 U.S.C. §§ 791 *et seq.*, which prohibits federal employers from discriminating and retaliating against employees based on a disability. *See* 29 U.S.C. § 791(f) (incorporating certain provisions of the Americans with Disabilities Act ("ADA") that relate to employment, including, among others, 42 U.S.C. §§ 12112 and 12203); 42 U.S.C. § 12112 (discrimination); 42 U.S.C. § 12203 (retaliation); *see generally* Compl. In his Complaint, Plaintiff alleges that USDA retaliated against him for engaging in protected activities—namely, for filing a Reasonable Accommodation request on February 13, 2015, and filing informal and formal EEO complaints on May 15, 2015, and June 23, 2015, respectively. *See* Compl. ¶¶ 114–21.

On July 13, 2016, Defendant filed a Motion to Dismiss, or in the Alternative, for Summary Judgment on the grounds that Plaintiff could not establish (1) that he was subject to an adverse employment action by virtue of being placed on the PIP; (2) that a causal link existed between his protected activity and the PIP; or (3) that Defendant's stated reason for placing him on the PIP was pretext for retaliation. *See* Def.'s Mot. to Dismiss, Mem. of Points & Authorities in Supp., ECF No. 6-2, at 1. On February 15, 2017, the court denied Defendant's Motion to Dismiss, holding that the imposition of a PIP "can constitute an adverse employment action" in the retaliation context. *See* Mem. Op. & Order, ECF No. 13 [hereinafter Mem. Op.], at 5–6.[9] The court also declined to enter summary judgment in Defendant's favor before Plaintiff had the opportunity to engage in discovery. *See id.* at 7–9.

---

[9] To be clear, the court did not hold that *every* PIP constitutes an adverse action for purposes of a retaliation claim, only that the alleged PIP in this case constituted a plausible adverse action. Defendant does not, in the present motion, challenge the initiation of the PIP as satisfying the adversity element.

Defendant renewed his motion for summary judgment on November 8, 2017. *See* Def.'s Mot. That motion is now ripe for the court's consideration.

## III.  LEGAL STANDARD

### A.  Summary Judgment

Federal Rule of Civil Procedure 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Defendant, as the moving party, has the "burden of coming forward with proof of the absence of any genuine issues of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material when it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Because credibility determinations and the weighing of evidence are functions for the jury and not the judge, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. "The inferences must be reasonable, however, and the non-moving party can only defeat a motion for summary judgment by responding with some factual showing to create a genuine issue of material fact." *Williams v. Callaghan*, 938 F. Supp. 46, 49 (D.D.C. 1996).

"A dispute over a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Arrington v. United States*, 473 F.3d 329, 333 (D.C. Cir. 2006) (internal quotation marks omitted). The inquiry of the court, therefore, is not to determine which side has the better case, but to determine if there is "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. When opposing a motion for summary judgment, however, the non-movant "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Id.* at

256. If the evidence, even taking all inferences in the light most favorable to the non-movant, is "so one-sided" that no jury could reasonably find for the non-movant, then summary judgment should be granted. *Id.* at 252. Accordingly, the burden on Defendant in the instant case is to demonstrate "that there is an absence of evidence to support [Plaintiff's] case." *Celotex Corp.*, 477 U.S. at 325.

## B.    Retaliation Claims Under the Rehabilitation Act

The Rehabilitation Act of 1973, as amended, "requires that federal employers provide 'reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability.'" *Doak v. Johnson*, 798 F.3d 1096, 1098 (D.C. Cir. 2015) (quoting 42 U.S.C. § 12112(b)(5)(A), a provision of the ADA incorporated into the Rehabilitation Act, *see* 29 U.S.C. § 791(f)). As relevant here, the Rehabilitation Act "also prohibits retaliation against an individual for exercising [his] rights under the Act." *Id.* at 1099; *see* 42 U.S.C. § 12203; 29 U.S.C. § 791(f).

Where, as in this case, there is no direct evidence of retaliation, the court must follow the familiar burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Morgan v. Fed. Home Loan Mortg. Corp.*, 328 F.3d 647, 650–51 (D.C. Cir. 2003); *see Doak*, 798 F.3d at 1107. Under that framework, a plaintiff must first establish a prima facie case of retaliation by showing that (1) he "engaged in statutorily protected activity"; (2) he "suffered a materially adverse action by [his] employer"; and (3) "a causal link connects the two." *Doak*, 798 F.3d at 1107 (internal quotation marks omitted). "If a *prima facie* case is established, the burden shifts to the employer to produce a legitimate, nondiscriminatory reason for its action." *Id.* (internal quotation marks omitted). This burden, however, is one of production; the employer "need not persuade the court that it was actually motivated by the proffered reasons." *Texas Dep't*

*of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981).  Rather, to satisfy its burden, the employer "must clearly set forth, through the introduction of admissible evidence, the reasons for the [the adverse action]." *Id.* at 255.  "Once the employer does so, the plaintiff must respond with sufficient evidence to create a genuine dispute on the ultimate issue of retaliation by showing either directly that a discriminatory reason more likely motivated the employer, or indirectly that the employer's proffered explanation is unworthy of credence." *Doak*, 798 F.3d at 1107 (internal quotation marks omitted).

At the summary judgment stage, however, once an employer comes forward with a legitimate, non-retaliatory justification for its action, the *McDonnell Douglas* framework "disappears," and the court "looks to whether a reasonable jury could infer . . . retaliation from all the evidence, which includes not only the prima facie case but also the evidence the plaintiff offers to attack the employer's proffered explanation for its action and other evidence of retaliation." *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009); *see also Doak*, 798 F.3d at 1107 (noting, at the summary judgment stage, that because the defendant came forward with a legitimate reason for its action, the only question was whether the plaintiff's evidence "create[d] a material dispute on the ultimate issue of retaliation" (quoting *Jones*, 557 F.3d at 678)).

## IV.  DISCUSSION

Defendant moves for summary judgment as to Plaintiff's retaliation claims on two grounds. First, as to the claim that Defendant retaliated against Plaintiff for his Reasonable Accommodation request by placing Plaintiff on the PIP, Defendant argues that Plaintiff cannot establish that Defendant's reasons for placing Plaintiff on the PIP were pretext for a retaliatory motive.  Second, as to the claim that Defendant retaliated against Plaintiff for his EEO activity by extending the PIP, Defendant argues only that Plaintiff cannot establish a prima facie case of retaliation in

response to Plaintiff's EEO activity; he does not, notably, offer a non-retaliatory reason for extending the PIP. Plaintiff claims that there are genuine issues of material fact such that a reasonable jury could find in his favor on both grounds.

For the reasons stated below, the court denies Defendant's Motion for Summary Judgment.

## A.    Retaliation Based on the Reasonable Accommodation Request

### 1.    *Defendant's Non-Retaliatory Reason for Initiating the PIP*

Plaintiff claims that he was placed on the PIP in retaliation for filing his Reasonable Accommodation request. *See* Compl. ¶¶ 114–21. Defendant does not dispute that Plaintiff has made out a prima facie case of retaliation. *See* Def.'s Mot., Mem. of Points & Authorities in Supp. [hereinafter Def.'s Mem.], at 4. Instead, he asserts a legitimate, non-discriminatory reason for placing Plaintiff on the PIP: poor performance. *Id.* at 4–6. When questioned about why Plaintiff was put on the PIP, Sisto stated that "[t]here was money being wasted . . . . Things weren't being corrected. Responsiveness was down. Restoral of services was down." Sisto Dep. I at 57. Sisto testified that these were all responsibilities of Plaintiff and his team. *Id.* at 56. In addition, there are numerous emails on the record that document instances where payments were missed, accounts were not closed, and tickets were left open, which necessitated Plaintiff's supervisors to reach out to him directly to deal with the issues—or, in some cases, necessitated Plaintiff's supervisors to deal with the issues themselves. *See* Sisto Decl. at 63–66, ¶¶ 4–15. Thus, having produced evidence showing a legitimate reason for placing Plaintiff on the PIP, the remaining question for the court is "whether [Plaintiff] produced sufficient evidence for a reasonable jury to find that [Defendant's] asserted . . . non-retaliatory reason was not the actual reason and that [Defendant]

intentionally . . . retaliated against [Plaintiff]." *Ames v. Nielsen*, 286 F. Supp. 3d 70, 79 (D.D.C. 2017) (quoting *Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015)).

### 2. *Plaintiff's Evidence of Pretext*

Plaintiff's evidence of pretext includes (1) the temporal proximity of the Reasonable Accommodation request, (2) an email about the equity of various employees' teleworking arrangements, (3) Thompson's opinion of the PIP and Plaintiff's performance, (4) Plaintiff's prior positive performance evaluations and explanations of his performance issues, (5) an expert report opining on the PIP's non-compliance with statutory and regulatory requirements prepared by a former government employee, Michael Keegan, and (6) the extension of the PIP beyond its expected deadline. The court finds this case to be a close call, but given the temporal proximity of the Reasonable Accommodation request and the PIP, certain admissible opinion testimony of Keegan, and the extension of the PIP past its expected deadline, the court concludes that a reasonable juror could find in Plaintiff's favor here.

### a. Temporal Proximity

As noted above, Plaintiff first points to temporal proximity in support of pretext. While "a close temporal relationship may alone establish the required causal connection" to make out a prima facie case of retaliation, *Singletary v. District of Columbia*, 351 F.3d 519, 525 (D.C. Cir. 2003), temporal proximity alone is not enough to prove pretext. As the D.C. Circuit has observed, "[i]f temporal proximity sufficed to rebut a legitimate proffer, then protected activities would effectively grant employees a period of immunity, during which no act, however egregious, would

support summary judgment for the employer in a subsequent retaliation claim." *Woodruff v. Peters*, 482 F.3d 521, 530 (D.C. Cir. 2007).

In this case, Plaintiff's supervisors first learned of his Reasonable Accommodation request on March 3, 2015. Sisto Decl. at 66, ¶ 19. And, while Thomas signed and dated Plaintiff's PIP April 10, 2015, Thomas first called Human Resources to ask about the PIP on April 3, 2015. Pl.'s Ex. 3 at 63, 66; *see also* Pl.'s Ex. 2 at 14. This close-in-time relationship between Plaintiff's protected activity and the adverse action, although not sufficient by itself to establish pretext, does weigh in favor such a finding.

        b.    <u>Sisto and Stevens's "Equity Email"</u>

Plaintiff also relies on an email between Sisto and Stevens concerning the equity of employees' teleworking arrangements as evidence of pretext. Pl.'s Opp'n, Mem. in Supp., ECF No. 27-2 [hereinafter Pl.'s Mem.], at 5–6; *see also* Pl.'s Ex. 3 at 1. Specifically, on December 4, 2014, Stevens forwarded an email to Sisto attaching a telework participation report for Stevens and Sisto's program area. Pl.'s Ex. 3 at 1. In that email, Stevens told Sisto that they "[n]eed to discuss the equity of this[.]" *Id.* In her deposition, Sisto explained that she and Stevens were discussing whether "people were implementing the policy equitably" to ensure that they "didn't have disparity going on where some supervisors were saying nobody could telework, and some people were saying you can telework as much as you want." Sisto Dep. II at 8.

Plaintiff asks the court to infer from this "equity email" that Plaintiff's supervisors issued the PIP in retaliation for his request to telework. Pl.'s Mem. at 5–6. While the court is required to draw all inferences in the Plaintiff's favor, those inferences still must be "reasonable." *See Williams*, 938 F. Supp. at 49. In this case, Plaintiff's favored inference is not a reasonable one given Sisto's unrebutted explanation of its meaning and the timing of Plaintiff's Reasonable

Accommodation request. First, Sisto explained in her deposition exactly what the statement in Stevens's email meant, and Plaintiff has offered no evidence that this general email was specific to him in any way. There is no evidence on the record to suggest that Sisto and Stevens discussed between themselves how Plaintiff's specific telework situation was inequitable or that they discussed it with Plaintiff himself. Nor is there any evidence showing that Sisto and Stevens were upset about Plaintiff's telework situation. Second, the email was exchanged in December 2014, when Plaintiff had already been teleworking for over a year and *before* he made the Reasonable Accommodation request. Pl.'s Ex. 3 at 1; *see* Crowley Dep. I at 28. Even if Sisto and Stevens could be viewed generally as hostile towards teleworking, it is too far a logical leap to then say they retaliated against Plaintiff for requesting a teleworking arrangement to accommodate his disability. Accordingly, the "equity email" provides little evidence of pretext.

          c.      <u>Thompson's Opinion of the PIP and Plaintiff's Performance</u>

In his Complaint, Plaintiff alleged that Thompson informed him that he was being placed on the PIP in retaliation for teleworking and that Thompson disagreed with the reasons that Plaintiff was placed on the PIP. *See* Compl. ¶¶ 30–37, 43–47, 56–59. Now, Plaintiff wishes to rely on those assertions to defeat summary judgment. But Plaintiff offers no *evidence* to support that Thompson ever made such statements. He did not depose Thompson or obtain an affidavit from him. Nor is there deposition testimony or an affidavit from Plaintiff in the record attesting to what Thompson purportedly told him about the PIP. *See generally* Crowley Dep. I; Crowley Dep. II. Indeed, the only record evidence about what Thompson said or did not say comes from a brief affidavit obtained by Defendant from Thompson, in which he denies ever having had any conversation with Plaintiff about the PIP. Thompson Decl. at 59–60, ¶¶ 3–5. Because Plaintiff's

assertion about what Thompson said rests on "mere allegation[s] . . . of his pleading," *Anderson*, 477 U.S. at 256, he cannot rely on them to defeat summary judgment.

Alternatively, Plaintiff relies upon statements made by Thompson during the EEO investigation of pretext, specifically Thompson stated that he did "not agree or disagree" as to whether placing Plaintiff on a PIP was warranted, *see* Pl.'s Ex. 2 at 6. Plaintiff asks the court to infer from these statements that Thompson did not agree with putting Plaintiff on the PIP. Pl.'s Mem. at 23. The court, however, cannot draw the suggested inference here, as Thompson's statement is simply too ambiguous. Moreover, even if Thompson did view the PIP as unwarranted, such evidence is of little probative value. According to Thompson, it was Sisto who made the decision to put Plaintiff on the PIP, *see* Pl.'s Ex. 2 at 6, and, therefore, the only relevant appraisal of Plaintiff's work is Sisto's as the decision maker, not Thompson's. *See Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (noting that "the issue is . . . whether the employer honestly believes in the reasons it offers" for the challenged action, not "the correctness" of the reasons). Plaintiff has produced no evidence that Thompson played any role in deciding *to place* Plaintiff on the PIP, as opposed to merely executing the instructions of his superiors to do so.

Accordingly, the record lacks any probative evidence as to Thompson's views that would support an inference of pretext.

> d. Plaintiff's Prior Success and Explanations of Performance Issues

Moving onto Plaintiff's prior success as evidence of pretext, Plaintiff points out that he has "received above average performance ratings dating all the way back to the 1990s." Pl.'s Mem. at 11. The court notes, however, that an "employer's description of an employee's performance as unsatisfactory will not be deemed pretextual just because the employee was a good performer at an earlier time." *Hicks v. Gotbaum*, 828 F. Supp. 2d 152, 163 (D.D.C. 2011). In *Bennett v.*

*Solis*, the plaintiff had successful performance reviews prior to being placed on a PIP, but was ultimately fired for failing to meet the performance elements set out in his PIP. 729 F. Supp. 2d 54, 70–71 (D.D.C. 2010). The plaintiff argued that because he had prior successful performance reviews, the defendant's stated reason for firing him (that he had failed his PIP) must be pretextual. *Id.* However, the court found that despite those successful performance reviews in prior years, the plaintiff's performance had "deteriorated and bec[o]me unacceptable." *Id.* at 71. Thus, while an employee may have done his job well in the past, there is nothing that necessarily prevents his performance from deteriorating later or new management stepping in and starting to notice existing issues, as Defendant claims happened in this case, *see* Def.'s Mem. at 4–7.

Nor do Plaintiff's protestations to the proffered reasons for the PIP establish pretext. Plaintiff offers a rebuttal for why his performance fell short—namely that it was not his fault, as his team was understaffed and already behind even before Plaintiff began working at USDA. Crowley Dep. II at 13–14. But he does not dispute that his supervisors honestly and reasonably believed that his work fell short of expectations. *See Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 496 (D.C. Cir. 2008) ("The question is not whether the underlying [incident warranting termination] occurred; rather, the issue is whether *the employer honestly and reasonably believed* that the underlying [incident warranting termination] occurred."). Accordingly, he cannot rely on his proffered "extenuating circumstance" for his criticized work as evidence of pretext. *Waterhouse v. District of Columbia*, 298 F.3d 989, 995 (D.C. Cir. 2002) (holding that the plaintiff's evidence—that there were "extenuating circumstances" outside the plaintiff's control causing her poor performance—was insufficient to establish that her "employer's proffered explanation [was] unworthy of credence," especially given the fact that the plaintiff admitted that

the underlying incidents forming the defendant's proffered reason did occur (alteration in original)).

Accordingly, Plaintiff's prior successful performance does not support an argument of pretext, nor do his explanations for his performance issues prove that Defendant's proffered reasons are unworthy of credence.

e.    The Keegan Report

Plaintiff also relies on the expert testimony of Michael Keegan concerning the PIP. *See generally* Keegan Rep. Keegan has twelve years of experience in management positions in federal agencies, including preparing and executing PIPs. *Id.* at 9–10. While Defendant does not dispute Keegan's credentials to opine on the PIP, *see* Def.'s Reply, ECF No. 29, at 5–6, he does ask the court to find Keegan's proposed opinion testimony to be "inaccurate and speculative" under Federal Rule of Evidence 702, *see id.* at 6. Thus, at least implicitly, Defendant asks the court to exclude the Keegan Report. *See id.* (stating that Keegan's report "should not be relied upon").

Courts must proceed "cautious[ly]" when deciding whether to exclude expert testimony at the summary judgment stage. *Carmichael v. West*, No. 12-cv-1969, 2015 WL 10568893, at *7 (D.D.C. Aug. 31, 2015) (citation omitted). Chief Judge Howell's discussion in *Carmichael* on the subject is instructive and thus merits quotation in full:

> While a *Daubert* analysis at the summary judgment stage may seem premature or, at least, unconventional, "[a] trial court has discretion to conduct the reliability and helpfulness analysis that *Daubert* and Rule 702 require in the context of a summary judgment motion, and to exclude expert testimony found wanting from its consideration in ruling on the motion." 4 Jack B. Weinstein & Margaret A. Berger, WEINSTEIN'S FEDERAL EVIDENCE, § 702.05[4] (Joseph M. McLaughlin, ed., Matthew Bender 2d ed.2013); *see also Cortes–Irizarry v. Corporacion Insular de Seguros*, 111 F.3d 184, 188 (1st Cir. 1997) ("The *Daubert* regime can play a role during the summary judgment phase of civil litigation. If proffered expert testimony fails to cross *Daubert*'s threshold for admissibility, a

district court may exclude that evidence from consideration when passing upon a motion for summary judgment." (citing cases)). Courts have expressed concern, however, about the use of the *Daubert* analysis at the summary judgment stage, instructing that "[b]ecause the summary judgment process does not conform well to the discipline that *Daubert* imposes, the *Daubert* regime should be employed only with great care and circumspection at the summary judgment stage." *Cortes–Irizarry*, 111 F.3d at 188. The First Circuit explained "that at the junction where *Daubert* intersects with summary judgment practice, *Daubert* is accessible, but courts must be cautious—except when defects are obvious on the face of a proffer—not to exclude debatable scientific evidence without affording the proponent of the evidence adequate opportunity to defend its admissibility." *Id.*

*Id.* Thus, consistent with *Carmichael*, the court views Defendant's Rule 702 argument "with great care and circumspection." *Id.* (quoting *Cortes–Irizarry*, 111 F.3d at 188).

Keegan's expert report and the opinion he proffers are not free from problems. Indeed, some are obvious. For example, Keegan's ultimate opinion is that the PIP "didn't comply with the requirements of the Code of Federal Regulations." Keegan Rep. at 14. The D.C. Circuit has held, however, that expert testimony cannot contain "legal conclusions." *Burkhart v. Wash. Metro. Area Transit Auth.*, 112 F.3d 1207, 1212 (D.C. Cir. 1997). While "an expert may offer his opinion as to facts that, if found, would support a conclusion that the legal standard at issue was satisfied . . . he may not testify as to whether the legal standard has been satisfied." *Id.* at 1213. Thus, while Keegan is able to testify as to the specific facts he found and whether the PIP is consistent with regulatory requirements and best practices, he may not express the legal opinion that the PIP violated federal regulations. Accordingly, Keegan's opinions that embrace legal conclusions are not admissible and may not be taken into account by the court.[10]

---

[10] Keegan additionally opines on other subject matters that are plainly off limits. For instance, he opines that he "found that many of the interrogatory responses were evasive and non responsive." Keegan Rep. at 5. Except perhaps in the rare legal malpractice case, an expert cannot opine on a party's compliance with discovery obligations. He also

Additionally, the basis for Keegan's testimony is opaque. Keegan's report does not clearly state what evidence he actually reviewed to form his opinions. Keegan identifies a short list of materials that he "considered in formulating [his] opinion," Keegan Rep. at 14, yet at the same time broadly states that his conclusions are based on "Crowley's legal complaint, agency interrogatory responses and discovery documents provided by the Department of Agriculture." *Id.* at 1; *see also id.* at 14 ("I conducted a thorough review of the agency interrogatory responses and document production."). Thus, it is not at all clear to the court how much of the discovery Keegan actually reviewed.

Clear factual errors in Keegan's report only underscore this concern. For example, Keegan states, without further explanation, that "[t]here is nothing in the agency document production . . . that document any specific deficiencies with Mr., (sic) Crowley's performance and the justification for the PIP." *Id.* at 12. The record, of course, contains numerous examples to the contrary. *See, e.g.*, Sisto Emails. Elsewhere, he states that, "[s]ubsequent to Mr. Crowley being placed on a PIP, he submitted a formal request for Reasonable Accommodation." Keegan Rep. at 11. However, the exact opposite is true: Plaintiff claims that he was retaliated against with a PIP because of his Reasonable Accommodation request. *See* Pl.'s Mem. at 16–23. Keegan's struggle with basic facts is worrisome.

Notwithstanding the deficiencies of Keegan's report, the court is not prepared to exclude it altogether at this stage.[11] For example, Keegan explains that the initiation and administration of a PIP typically follow strict guidelines under 5 C.F.R. § 432.104, 5 U.S.C. § 4302, and internal regulations from the Office of Personnel Management. Keegan Rep. at 2–6, 11. Although Keegan

---

observes that "[n]umerous documents in the agency document production indicate that Supervisor Thompson had substantial trust in Mr. Crowley as a Manager." *Id.* at 3. That is plainly a determination for the finder of fact.

[11] This is not to say that Defendant ought not to consider a pre-trial *Daubert* motion.

may not offer the ultimate opinion testimony that the PIP "didn't comply with the requirements of the Code of Federal Regulations," *id.* at 14, he may offer testimony as to the ways in which he views the PIP as having fallen short of legal requirements or best practices. For instance, he notes as shortcomings the PIP's unreasonable expectations and subjective criteria; Defendant's failure to meet with Plaintiff consistently to monitor his performance; and the undocumented, unexplained extension of the PIP past June 22, 2015. *Id.* at 11–14. Testimony on these issues is arguably admissible, and the court is reluctant to conclude otherwise at this stage without the aid of a *Daubert* hearing.

Considering then what is potentially proper expert testimony, Keegan aids Plaintiff's assertion of pretext. One way that an employee can prove his employer's stated reason is pretext is by pointing to the "employer's failure to follow established procedures or criteria." *Brady*, 520 F.3d at 495 n.3. Here, a reasonable jury could find that the deficiencies in preparation and execution of the PIP that Keegan identifies, *see* Keegan Rep. at 11–14, are evidence that the true motive behind the PIP was not to improve Plaintiff's performance, but to punish him for seeking reasonable accommodation. Thus, portions of Keegan's testimony create a genuine dispute of fact as to the question of pretext.

f. The Extension of the PIP

Finally, Plaintiff points to the extension of his PIP past its expected end date of June 22, 2015, as evidence of pretext, arguing that the extension shows that the PIP was not meant to actually bring Plaintiff's performance to an acceptable level but to punish him for a longer period of time. Pl.'s Mem. at 22. The PIP formally began on April 24, 2015, had an expected duration of 60 days, and had an expected end date of June 22, 2015. Pl.'s Ex. 3 at 65. Defendant asserts that Plaintiff was placed on the PIP because of "poor performance," Def.'s Mem. at 6, and,

according to Sisto, the goal of the PIP was "to improve [Plaintiff's] performance." Sisto Dep. I at 57. Sisto also asserted in her deposition that in early June Plaintiff had "met the . . . criteria set forth in the PIP . . . and that [Osman] wanted [Plaintiff] to come off of [the PIP]." Sisto Dep. II at 21. Despite Sisto's—and, according to her, Osman's—opinion that Plaintiff had met the criteria of the PIP, the PIP did not officially end until November 10, 2015. Crowley Dep. I at 43. Indeed, there are emails on the record from Osman to Plaintiff and vice versa that show that not only was the PIP still active through July, September, and October, but that there were still regular meetings scheduled to discuss Plaintiff's performance and the PIP. *See* Pl.'s Ex. 6 at 1, 3; *see also* Keegan Rep. at 7. The PIP's unexplained, undocumented continuance after Plaintiff had met the criteria to improve his performance could be construed by a reasonable jury as reason to question the original explanation for the PIP. Indeed, a rational trier of fact could conclude that, if the PIP truly was for the purpose of improving Plaintiff's performance, it would have ended when his performance improved. The fact that the PIP did not timely end might reasonably be viewed as reinforcing the original retaliatory objective. Accordingly, the extension of the PIP past its expected end date is evidence of pretext.

* * *

It bears repeating that the court views this as a close case. But viewing all the evidence in the light most favorable to Plaintiff, the combination of the close temporal proximity of the PIP and the Reasonable Accommodation request; the deficiencies of the PIP; and the unexplained, undocumented extension of the PIP for months after the initial 60-day period, the court concludes that a reasonable jury could find that Plaintiff was placed on the PIP in retaliation for his Reasonable Accommodation request. Accordingly, the court denies Defendant's Motion for

Summary Judgment with respect to Plaintiff's claim that he was placed on the PIP in retaliation for his Reasonable Accommodation request.

## B.     Retaliation Based on Plaintiff's EEO Activity

Plaintiff also claims that Defendant retaliated against him for his EEO activity by extending the PIP beyond the expected end date of June 22, 2015, despite Plaintiff having met the PIP's performance objectives by June 19, 2015. *See* Pl.'s Mem. at 24–25. Defendant's sole response to this claim is that Plaintiff has failed to make out a prima facie case; he does not advance a non-retaliatory reason for the extension. Defendant asserts that Plaintiff falls short on two elements: (1) the extension of the PIP does not constitute an adverse action, and (2) Plaintiff cannot establish a causal link between his EEO activity and the continuation of the PIP. *See* Def.'s Mem. at 8–9. The court concludes otherwise.

### 1.     *Plaintiff's Prima Facie Case*

#### a.     Continuation of the PIP as "Materially Adverse" Action

This court already has held, in the context of Defendant's motion to dismiss, "that the imposition of a PIP—even one that does not result in a negative impact on salary, grade or performance appraisal—can constitute an adverse action." Mem. Op. at 6. The question here is slightly different and appears to be one of first impression: Whether the *continuation* of a PIP beyond its expected end date constitutes material adversity for purposes of a retaliation claim. Based on the record evidence, the court finds that in this case it does.

"'Adverse Actions' in the retaliation context encompass a broader sweep of actions than those in a pure discrimination claim." *Baloch v. Kempthorne*, 550 F.3d 1191, 1198 n.4 (D.C. Cir. 2008). To satisfy the adversity element in the retaliation context, a plaintiff must prove that he suffered a "materially adverse" action. *See id.* at 1198. An action is "materially adverse" if it is

one that would "dissuade[] a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). Material adversity does not, however, encompass "trivial harms." *Id.* Thus, "petty slights, minor annoyances, and simple lack of good manners [normally] will not create such deterrence." *Id.*

The continuation of Plaintiff's PIP in this case satisfies the *Burlington Northern* standard. Plaintiff's PIP specifically states that should Plaintiff not meet the "Fully Successful" level in his performance reviews, then "the Agency is bound by statute to remove [him] from Federal service, demote [him] to a lower grade, or reassign [him] to another position." Pl.'s Ex. 2 at 14. Furthermore, according to Keegan, remaining on a PIP can result in "[d]isqualification from any applicable performance bonus or incentives," and hiring managers in other departments will frequently look at parts of the employee's record, such as PIPs, when making hiring decisions. Keegan Rep. at 13. Thus, the consequences of not meeting a PIP's objectives are stark. Yet, without apparent regard for these consequences, Defendant in this case left Plaintiff on a PIP for months after Plaintiff met its objectives. The PIP began on April 24, 2015, but did not end until November 10, 2015. Pl.'s Ex. 3 at 65; Crowley Dep. I at 43. Plaintiff satisfied the PIP in early June, *see* Sisto Dep. II at 21, yet the undisputed evidence shows that his superiors blithely kept the PIP hanging over his head, providing him with no explanation for why his job and his future prospects remained at risk if he failed to perform. Thus, a reasonable jury could conclude that Plaintiff's having to work under such uncertain conditions for an extended period constitutes an adverse action.

b.     <u>Causal Link Between the PIP and EEO Activity</u>

As discussed above, "a close temporal relationship may alone establish the required causal connection" for purposes of satisfying a plaintiff's prima facie case. *Singletary*, 351 F.3d at 525.

Here, the temporal proximity between the protected activity and adverse action easily satisfies the prima facie causation element. Plaintiff filed his informal EEO complaint on May 15, 2015. Pl.'s Ex. 2 at 1. One month later, on June 19, 2015, Osman emailed Sisto to inform Sisto that he had a meeting planned with Plaintiff and intended to discuss with Plaintiff that he had reached an acceptable level of performance and that Osman therefore would close out the PIP. *See* Pl.'s Ex. 3 at 70; Sisto Dep. II at 16 (Sisto testimony that "Mr. Osman had told us that . . . he felt that Mr. Crowley's performance had improved to an acceptable level and he could come off the PIP" in early June). Yet, without explanation, Plaintiff remained on the PIP. Then, on June 23, 2015, Plaintiff filed his formal EEO complaint alleging that his placement on the PIP was in retaliation for his Reasonable Accommodation request. Pl.'s Ex. 2 at 1. On July 15, 2015, Osman sent an email with the subject line "PIP" stating that he "did not have time to meet last Friday" and giving Plaintiff a list of objectives regarding the PIP, clearly showing formal continuation of the PIP. Pl.'s Ex. 6 at 3. On September 14, 2015, Osman emailed Plaintiff to state that he "intends to make a final assessment and recommendation regarding the PIP status on Friday 09/18/2015." *Id.* at 2–3. On November 10, 2015, the PIP was closed out. Crowley Dep. I at 43. Given the "close temporal relationship" between the EEO activity and the continuation of the PIP, and Osman's failure to close out the PIP in June 2015 despite Plaintiff meeting the PIP's performance goals, Plaintiff has established a causal link between his EEO activity and the continuation of the PIP to satisfy the causation element of a prima facie case.

## V.     CONCLUSION AND ORDER

For the foregoing reasons, the court finds that a reasonable jury could find that Defendant retaliated against Plaintiff both for Plaintiff's Reasonable Accommodation request and his EEO

activity by placing him on, and ultimately extending, the PIP. Accordingly, the court denies Defendant's Motion for Summary Judgment.

Dated: July 27, 2018

Amit P. Mehta
United States District Judge